Lee E. SHELTON, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–1050.

District of Columbia Court of Appeals.

Argued Oct. 28, 1997.
Decided Dec. 24, 1998.

---

John T. Riely, Washington, DC, appointed by the court, for appellant.

Adam L. Rosman, Assistant United States Attorney, with whom Eric H. Holder, United States Attorney at the time the brief was filed, John R. Fisher, Roy W. McLeese III and Colleen M. Kennedy, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN and RUIZ, Associate Judges, and RANKIN *, Associate Judge, Superior Court of the District of Columbia.

STEADMAN, Associate Judge:

In this appeal, we are asked to construe provisions of the Good Time Credits Act of 1986, specifically D.C.Code § 24–431(a), (c) (1996), and their interaction with the Sexual Psychopath Act ("SPA") enacted in 1948, D.C.Code §§ 22–3503 to –3511 (1996). The precise issue before us is whether a defendant may receive credit for time spent confined under the SPA at St. Elizabeths Hospital, where the trial court orders and the defendant serves that confinement subsequent to a guilty plea to sexual offenses but prior to sentencing on the plea. We hold that such credit must be given in the circumstances here.

### I.

In April 1990, Appellant Lee Shelton pled guilty to two counts of taking indecent liberties with a minor child, D.C.Code § 22–3501(a) (1981) (repealed 1995), and four counts of simple assault. Prior to sentencing on these offenses, Shelton moved to compel the government to file a sexual psychopath statement under the SPA.[1] Over the government's objection, the trial court granted the motion and the statement was filed on December 21, 1990. On April 3, 1991, following an evidentiary hearing, the trial court adjudicated Shelton a sexual psychopath and ordered him committed to St. Elizabeths Hospital for an indefinite term under D.C.Code § 22–3508.[2]

After spending more than four and a half years in the John Howard Pavilion at St. Elizabeths,[3] Shelton filed an unopposed mo-

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

**1.** Such a statement must set forth "the facts tending to show" that the defendant is a "sexual psychopath." D.C.Code § 22–3504(c). Once filed, the statement operates to stay the underlying criminal proceedings. *See* D.C.Code § 22–3510.

**2.** The trial judge at the plea and the SPA hearing was the Honorable Ricardo M. Urbina, subsequently named to the United States District Court for the District of Columbia.

**3.** Appellant recounts that he was confined at all times and denied permission to leave even for short holiday periods. The government does not contest these assertions. We do not consider here whether his treatment at St. Elizabeths

tion to lift the stay of the criminal proceedings and proceed to sentencing. In his brief, he explains that it had become apparent that he "had received as much benefit from the program at St. Elizabeths as the program was going to offer."[4] The government withdrew the sexual psychopath statement and the trial court, on December 14, 1995, vacated the commitment order.

At sentencing, and after briefing and argument by both parties, the court addressed the question of whether it should provide in the judgment and commitment order that credit be given Shelton for his time spent at St. Elizabeths. The court stated that although it had doubts whether Shelton was entitled to such credit, and although it recognized that it had authority to act, the court would not rule on the matter but instead leave the determination to correctional authorities. The court proceeded to impose substantial consecutive sentences on Shelton for the six offenses to which he pled guilty.

## II.

The parties sharply dispute on appeal whether the trial court was obligated to rule on the credit issue. They differ in the interpretation of D.C.Code § 24–431(a), which in its entirety reads as follows:

Every person shall be given credit on the maximum and the minimum term of im-

prisonment for time spent in custody or on parole as a result of the offense for which the sentence was imposed. When entering the final order in any case, the court shall provide that the person be given credit for the time spent in custody or on parole as a result of the offense for which sentence was imposed.

This provision was included as part of the Good Time Credits Act of 1986, which is almost entirely devoted to matters dealing with the reduction of sentences by reason of "good time" during incarceration. Apparently for purposes of completeness, section 5 of the Act, codified as § 24–431, was inserted to deal with certain other situations where credit shall be given against the time served under the sentence, such as pretrial custody.[5] Prior to that time, there was no District of Columbia statute expressly authorizing credit against the sentence for time spent in confinement. *See United States Parole Comm'n v. Noble,* 693 A.2d 1084, 1088 (D.C.1997) ("*Noble I*"), *aff'd en banc,* 711 A.2d 85 (D.C. 1998) ("*Noble II*"). Recently, we had occasion to address en banc an interpretative problem of the first sentence of § 24–431(a) dealing with credit for time spent on parole. *See Noble II, supra,* 711 A.2d at 86 (adopting the majority opinion of *Noble I, supra,* 693 A.2d 1084).

Here, the parties dispute the meaning of the second sentence of that subsection.

---

strictly comported with the Act. We note that in *Miller v. Overholser,* 92 U.S.App.D.C. 110, 112–13, 206 F.2d 415, 417–18 (1953), the court ordered a remand for a factual inquiry into whether the petitioner, adjudicated a sexual psychopath and confined to St. Elizabeths, had been housed in a ward of the hospital populated by the "criminal[ly] insane" and whether the conditions there approximated criminal confinement in contravention of the Act. The court stated,

the facts which petitioner asserts depict a place of confinement for the hopeless and the violent, not a place of remedial restriction.... The incarceration of this petitioner in a place maintained for the confinement of the violent, criminal, hopeless insane, instead of in a place designed and operated for the treatment of the mentally ill who are not insane, is not authorized by the statute.

*Miller, supra,* 92 U.S.App.D.C. at 114–15, 206 F.2d at 419–20. In *Miller,* unlike the case before us, the petitioner had been confined prior to trial.

4. In his motion to the trial court, Shelton explained his wish to proceed to sentencing: "[T]he goal of the alternate sentencing structure has failed. The plan is not working and there appears to be little hope that any changes will be forthcoming." Both parties acknowledge that a sharp dispute existed over the entire treatment process, including the degree of Shelton's cooperation with it.

5. In addition to subsections (a) and (c), both of which are quoted in the text, § 24–431(b) describes a third occasion on which credit shall be given against a sentence:

When a person has been in custody due to a charge that resulted in a dismissal or acquittal, the time that would have been credited against a sentence for the charge, had the charge not resulted in a dismissal or acquittal, shall be credited against any sentence that is based upon a charge for which a warrant or commitment *detainer* was placed during the pendency of the custody.

Shelton focuses our attention on the requirement that the "court" make provision for credit. He argues that the plain meaning of the provision requires that the court make a determination at the time of sentencing as to any disputed credits, that such determinations are ultimately matters of law, and that the trial court decision as to the length of sentence to be imposed may be affected by such credits.[6]

The government, on the other hand, points out the difficulties in any literal application of the second sentence of § 24–431(a), such as the inability of the court in *its* "final order"[7] to say anything meaningful about time spent on "parole," which rarely if ever can occur prior to the order of judgment and commitment. The government also notes the apparent practice of leaving credit determinations to correctional authorities, to which the trial court referred here,[8] and suggests that any duty imposed by the "court shall provide" language would be satisfied if, upon specific request, the trial court simply "provide[d]" in

general terms that the defendant should be "given credit" for any time that may have been spent in pretrial custody. The government suggests that any detailed challenge to the actual determination by correctional authorities as to the grant *vel non* of claimed credit is properly raised only in a habeas corpus action.

We need not resolve these various arguments in the present appeal.[9] The proper interpretation of law relating to the grant of credit is ultimately a judicial matter. Shelton represents to us, without contradiction by the government, that correctional officials have determined that he will not receive credit for his time at St. Elizabeths under the SPA.[10] We are confident that the government has defended that position here as effectively as could be done through a habeas corpus action. Presenting as it does a purely legal question on undisputed facts, there is no need to return this case to the trial court for resolution of the ultimate issue, the subject to which we now turn.[11]

6. Compare, in this regard, our recent decision in *Francis v. United States,* 715 A.2d 894 (D.C. 1998), where the trial court adjusted a criminal sentence to reflect the apparent policy of correctional authorities to grant credit for presentence custody of the type to which the defendant in that case was subjected (halfway house). In contrast, the trial court in the case before us made it perfectly clear that its sentence was imposed without regard to SPA credit one way or the other, a decision it left entirely to the correctional authorities.

7. It is suggested that the drafters may have had in mind as the "final order" whatever document finally terminates the incarceration after all prison time and parole have been served. However, the trial court plays no part in such a document.

8. The trial court said, "what I normally do in cases anyway is when people—defendants stand up to me and say, Judge, give me hours in the halfway house this minute and I was over here this many months, make sure I get credit for time served, what I normally say, even not including any hospital settings, but just pretrial detention, when defendants start telling me to give them credit, I say, I'll just leave that up—I'll just sentence you and I'll leave whatever credit— you should get whatever credit you're entitled to by the Department of Corrections." In this regard, see *United States v. Wilson,* 503 U.S. 329, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992) (holding that under federal law Attorney General, not trial court, makes initial credit determination).

9. They do, however, suggest that some revision and clarification of the statutory language might be sought from the legislature.

10. Indeed, the government asserts that the Department of Corrections is applying "its now-established rule that appellant is not entitled to credit for that time." Thus, the concern underlying the requirement that relief first be sought from the agency is not present here.

The government does not invoke before us any principle of judicial deference to an agency determination. In any event, our court en banc recently rendered de novo review of a dispute over the application of the first sentence of § 24–431(a) in the face of long-standing contrary agency practice. *See Noble II, supra.* Furthermore, there, as here, the issue was not an interpretation of the Good Time Credits Act alone but rather the interplay between that and another statute, in our case a statute quite distinct from sentence computation. And the second sentence of § 24–431(a) in its reference to "the court" appears to contemplate a potential role for the court more significant than in ordinary cases of agency determinations.

11. While we do not decide whether the trial court was compelled to make a ruling on the issue of Shelton's entitlement to credit against the sentence for his time at St. Elizabeths under the SPA, we think the trial court has ultimate jurisdiction to do so, at least where, as here, the position of correctional officials is clear. In this

## III.

The SPA was enacted by the Congress in 1948 " 'as a humane and practical approach to the problem of persons unable to control their sexual emotions.' "[12] *Millard v. Harris,* 132 U.S.App.D.C. 146, 148, 406 F.2d 964, 966 (1968)(quoting S.Rep. No. 80–1377, at 5 (1948)). The Act defines a "sexual psychopath" as a

> person, not insane, who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his or her sexual impulses as to be dangerous to other persons because he or she is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his or her desire.

D.C.Code § 22–3503(1). To trigger operation of the SPA, the United States Attorney must file a "statement in writing setting forth the facts tending to show that" the person in question "is a sexual psychopath." D.C.Code § 22–3504(a), (b), (c). This statement may be filed independently of any criminal proceeding, whenever "it shall appear to the United States Attorney for the District of Columbia that any person within the District of Columbia ... is a sexual psychopath," D.C.Code § 22–3504(a), or it may be filed in connection with a criminal proceeding, either on the instigation of the United States Attorney, D.C.Code § 22–3504(b), or on the initiative of the court, D.C.Code § 22–3504(c).[13]

Following the filing of the statement, two psychiatrists are appointed to examine the individual, described in the statute as a "patient." *See* D.C.Code §§ 22–3503, 3506. If one or both concludes that the individual is not a sexual psychopath, the proceeding is dismissed; otherwise, the court holds a trial-type hearing—which may, at the patient's or the United States Attorney's demand, be tried to a jury—to determine the issue. *See* D.C.Code §§ 22–3507, –3508. If the patient is determined after the evidentiary proceeding to be a sexual psychopath, "the court shall commit" such person "to an institution to be confined there until released in accordance with § 22–3509." D.C.Code §§ 22–3508. Such release may occur only when the patient is determined to be "sufficiently recovered so as to not be dangerous to other persons." D.C.Code § 22–3509.

As indicated above, see *supra* note 1, the filing of a statement during the course of a criminal proceeding under § 22–3504(b) or (c),[14] stays the criminal proceeding until such time as either the SPA proceeding is dismissed without a hearing under § 22–3507, the fact-finder at the evidentiary hearing under § 22–3508 determines the patient not to be a sexual psychopath, or, if he or she is committed, "[t]he patient is discharged from an institution pursuant to § 22–3509." D.C.Code § 22–3510. The section on discharge of the patient also provides that if that person "be one charged with crime or undergoing sentence therefor," a supervisory official at the place of confinement "shall give notice [of the discharge] to the judge of the criminal court and deliver him or her to the court ...." D.C.Code § 22–3509.

By its terms, the SPA requires that a sexual psychopath be "not insane." Focusing on this feature of the Act, the D.C. Circuit in *Millard, supra,* 132 U.S.App.D.C. at 153, 406 F.2d at 971, significantly restricted its practical application. In an opinion by Chief Judge Bazelon, the court held that, because of "broad changes in the attitudes and language with which both lawyers and psychiatrists approach mental disturbances" since enactment of the SPA in 1948—and because

---

particular circumstance, given our conclusion set forth in Part IV, *infra,* we have determined to remand the case to the trial court for entry of a provision in the order of judgment and commitment consistent with this opinion.

12. The constitutionality of legislation of this sort had been established by the Supreme Court's decision in *Minnesota ex rel. Pearson v. Probate Court,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940).

13. The Act may not be invoked, however, with respect to any criminal defendant charged with first or second degree sexual abuse or assault with intent to commit such abuse. *See* D.C.Code § 22–3504(e).

14. Any statement filed in connection with a criminal proceeding may be filed only before trial, after conviction or plea of guilty but before sentencing, or after conviction or plea of guilty but before the completion of probation. *See* D.C.Code § 22–3504(d).

of an enactment in 1964, *see* D.C.Code §§ 21–501 to –592 (1997), providing for the civil commitment of persons with "mental illness" as opposed to prior legislation dealing only with "insanity," D.C.Code §§ 21–308 to –325 (repealed 1964)—the term "insane" as used in the SPA must be read more broadly to include mental illness generally. *Millard, supra,* 132 U.S.App.D.C. at 149–51, 406 F.2d at 965–67. Thus, the SPA, in excepting those "insane" from its reach, effectively excludes all those deemed "mentally ill." *Millard, supra,* 132 U.S.App.D.C. at 153, 406 F.2d at 971.

■ Prior to the 1964 civil commitment statute, "commitment as a sexual psychopath and so-called civil commitment were mutually exclusive." *Cross v. Harris,* 135 U.S.App. D.C. 259, 262, 418 F.2d 1095, 1098 (1969). Under this regime, the SPA was intended to "fill[ ] a gap in the commitment law," for the traditional civil commitment statutes applied only to those deemed insane. *Id.* According to *Millard* itself, its decision preserved this gap, however narrowly, in that it recognized the continued "coexistence of the 1964 Act regarding civil commitments and the Sexual Psychopath Act." *See* 132 U.S.App.D.C. at 151, 406 F.2d at 969. A later case challenged this proposition, questioning "whether there remains any gap for the Sexual Psychopath statute to fill," and asserting that "[u]nder *Millard,* it remains for future cases to show whether there are in fact any dangerous sexual recidivists who are not 'mentally ill' within the broad meaning of the [1964 civil commitment law]." *Cross, supra,* 135 U.S.App.D.C. at 262–63, 418 F.2d at 1098–99. In fact, it does not appear that any reported decision has dealt with a commitment under the SPA since the decision in *Cross.* The instant case is the first.

### IV.

On appeal, Shelton first claims that he is entitled to credit under D.C.Code § 24–431(a) for the almost five years that he was committed to St. Elizabeths, arguing that he was "in custody ... as a result of the offense for which sentence was imposed." Second, he argues cumulatively and alternatively that his case fits within a distinct subsection of

the provision of the Good Time Credits Act dealing with the granting of credit against sentences; namely, § 24–431(c). That subsection reads as follows:

Any person who is sentenced to a term of confinement in a correctional facility or hospital shall have deducted from the term all time actually spent, pursuant to a court order, by the person in a hospital for examination purposes or treatment prior to trial or pending an appeal.

The government in contesting these arguments relies particularly upon the proposition that by the very structure of the SPA, confinement thereunder is civil in nature, not criminal. It notes that to qualify for credit, any confinement pursuant to D.C.Code § 22–3508 must be "as a result of the offense for which sentence was imposed," D.C.Code § 24–431(a), or alternatively, to use its terminology, must be "part of the process by which the criminal case will proceed to final disposition," D.C.Code § 24–431(c), concepts in tension with a civil commitment.

■ The government is correct in its characterization of proceedings under the SPA as "civil" in nature. *See Miller, supra* note 2, 92 U.S.App.D.C. at 114–15, 206 F.2d at 419–20; *Malone v. Overholzer,* 93 F.Supp. 647, 647 (D.D.C.1950); *cf. Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (construing Illinois Sexually Dangerous Persons Act). The SPA merely "extends the law relating to the commitment of persons who are mentally incompetent so as to include as possible subjects of commitment to a mental hospital[ ] persons who are sexual psychopaths as defined in the Act." *Malone, supra,* 93 F.Supp. at 647–48. As the D.C. Circuit noted in *Miller,* "[b]oth the intent and the terms" of the SPA "are for the commitment of these persons to a hospital for remedial treatment. They are denominated 'patients'. They are not confined for violation of law." 92 U.S.App.D.C. at 114, 206 F.2d at 419.

It may well be that a legislature could constitutionally provide that post-conviction time spent in confinement under the SPA, particularly if sought by the convicted defendant, not be credited against a subsequent

sentence based on that conviction.[15] *See Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 2081–85, 138 L.Ed.2d 501 (1997) (sustaining against double jeopardy attack confinement of appellant under Kansas's Sexually Violent Predator Act after completion of criminal imprisonment); *Dorfman v. State,* 351 So.2d 954, 957 (Fla.1977) (confinement after guilty plea under sexual predator commitment statute does not entitle defendant to credit against later criminal sentence); *State v. Newell,* 126 Vt. 525, 236 A.2d 656, 658 (1967) (same). The question before us, however, is what our legislation in fact provides in this regard.

### A.

Looking first at § 24–431(a), Shelton argues that in any realistic sense, he was "in custody" throughout his stay at the John Howard Pavilion of St. Elizabeths. He asserts without contradiction that the John Howard Pavilion is the "most restrictive of the levels of confinement" at St. Elizabeths. Nor does the government challenge the accuracy of his assertion that he "was held in locked confinement, not permitted to leave the ward to which he was assigned, was not able to leave for holidays,[16] and was in each and every way held in custody by the Superintendent of St. Elizabeths Hospital."[17] A number of status hearings were held before the court throughout the time Shelton was at St. Elizabeths.

The government challenges the assertion, however, that these conditions constituted "custody" under § 24–431(a) by citing us to the recent Supreme Court decision of *Reno v. Koray,* 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995). That case involved the interpretation of 18 U.S.C. § 3585(b) (1994), dealing with credit for presentence "official detention." The defendant pled guilty and prior to sentencing was sent to a community treatment center for 150 days. The Supreme Court accepted the government's argument that "official detention" meant "a

court order detaining defendant and committing him to the custody of the Attorney General." *Koray, supra,* 515 U.S. at 56, 115 S.Ct. 2021. Since the defendant had not yet been committed to such custody, he received no credit for his time at the community treatment center. The Court declined to decide such cases based on whether the defendant was subjected to "jail-type confinement." 515 U.S. at 64, 115 S.Ct. 2021.

The predecessor statute to 18 U.S.C. § 3585(b) used the term "in custody," and the Supreme Court in *Koray* noted that by changing the term to "official detention," Congress did not intend a substantive change in the law. *See* 515 U.S. at 59–60, 115 S.Ct. 2021; *see also* 18 U.S.C. § 3568 (1982) (repealed 1986). This is not necessarily definitive as to what the D.C. Council meant by the use of the term in enacting § 24–431(a), particularly in light of § 24–431(c), to which we shall shortly turn our attention. Also, in *Koray,* the defendant was "released" under the Bail Reform Act of 1984 and confined to a community treatment center as a condition thereof, and the Court contrasted that status under the statutory scheme with that of "detention." In no way was Shelton "released." Indeed, he was detained in jail for about a year and a half before going to St. Elizabeths. There is no dispute that he was entitled to credit for that period and for the six months that he spent in jail awaiting sentencing after his return from St. Elizabeths.

Also in dispute is whether that custody was "as a result of the offense for which sentence was imposed." *See Ali v. District of Columbia,* 612 A.2d 228, 230 (D.C.1992) (holding that if warrant for parole violation related to one offense has been validly executed before arrest on second offense, no credit is given against the second offense for time spent in custody after such execution because the custody is not as a "result of" that offense). To be sure, as a technical

---

**15.** But see note 23, *infra.*

**16.** Shelton filed several motions seeking short-term release, such as at Christmas. The government opposed all such motions and all apparently were denied.

**17.** We do not address whether our holding here would be otherwise if the conditions of confinement were less stringent.

matter, even if facts contained in the psychopath statement relate to underlying criminal offenses, it is not the criminal acts themselves which form the basis for SPA commitment. Rather, the definitional gravamen of an SPA action is a "course of repeated misconduct in sexual matters," suggesting such an inability to control sexual impulses as to be dangerous to the community.[18]

Nonetheless, when the SPA commitment comes hard on the heels of convictions for several sexual offenses and is seemingly based on the evidence that those convictions also rested upon, it would be a somewhat tortured reading of § 24–431(a) to say that the SPA custody was not "as a result of the offense" for which sentence was ultimately imposed. The close relationship between criminal proceedings and SPA commitment is plain from the very provisions of the Act itself, already set forth above, that contemplate that information of sexual psychopathy is prone to be revealed at a criminal proceeding and therefore provide a mechanism for the prosecutor or trial judge involved in such proceeding to initiate action under the Act. *See* D.C.Code § 22–3504(b), (c); *see also* D.C.Code § 22–3509 (providing that upon discharge under the Act, a person "charged with crime or undergoing sentence therefor" shall be delivered to the court).

### B.

However § 24–431(a) might be interpreted standing in isolation, we think that the gloss provided by § 24–431(c) in the interpretation of § 24–431(a) is determinative. Under § 24–431(c), quoted in full above, a person must be given credit[19] against a sentence for "all time actually spent, *pursuant to a court order*, ... in a *hospital* for examination pur-

poses *or treatment* prior to trial or pending an appeal." D.C.Code § 24–431(c) (emphasis added). St. Elizabeths is a hospital. Shelton was sent there by court order. And, as the court recognized in *Miller*, "[b]oth the intent and the terms" of the SPA "are for the commitment of these persons to a hospital for remedial *treatment*. They are denominated 'patients'." 92 U.S.App.D.C. at 114, 206 F.2d at 419 (emphasis added). "The legislative plan was 'to provide for the commitment and *treatment* of sexual psychopaths ....'" *Millard, supra,* 132 U.S.App. D.C. at 149, 406 F.2d at 967 (quoting S.Rep. No. 80–1377, at 5 (1948)) (emphasis added).

It is true that the subsection does not literally cover the case before us, because the SPA confinement was neither "prior to trial" nor "pending an appeal." Interestingly, the government makes no argument against the application of the subsection on this basis, much less its relevance to the interpretation of § 24–431(a). Rather, the government maintains that the subsection only applies to hospital commitments that are "part of the process by which the criminal case will proceed to final disposition," such as competency examinations. This may well be so, and may explain the temporal limitations contained in the subsection as relating to those periods when such hospital commitments might be anticipated.[20]

Even if so interpreted, however, the subsection still appears to reflect a general legislative approach that time spent in hospitals for examination or treatment, if pursuant to court order during the course of a criminal proceeding, may in certain circumstances have a sufficient element of involuntary confinement to warrant credit against a sentence arising out of that proceeding.[21] Indeed,

---

**18.** Certainly, criminal acts may constitute evidence, among other relevant facts, of a "course of repeated misconduct in sexual matters," but the elements necessary to prove sexual psychopathy and those essential to prove an underlying criminal offense are conceptually distinct. *See Allen, supra,* 478 U.S. at 371, 106 S.Ct. 2988 (holding civil commitment statute not punitive where evidence of prior criminal conduct used not for punishment, but "primarily to show the accused's mental condition and to predict future behavior").

**19.** Oddly, subsection (c) refers to the "deduction" of time spent in the hospital from the "term of confinement," rather than the crediting of the time against the sentence. But we perceive no distinction between the two concepts relevant here.

**20.** We are not cited to, nor have we been successful in locating, anything in the legislative history of the Good Time Credits Act illuminating this question.

**21.** We do not think that too much should be made of the fact that Shelton proposed commit-

where applicable by its terms, § 24–431(c) literally read allows for credit for "all time actually spent" in the hospital regardless of the degree of actual confinement, if any, so long as the stay was "pursuant to court order." *Cf. Harman v. United States*, 718 A.2d 114 (D.C. 1998) (acquittee by reason of insanity confined to St. Elizabeths but serving concurrent criminal sentence denied conditional release from hospital). We see no indication that the legislature intended to occupy the field by the precise terms of § 24–431(c), particularly in light of the narrow interpretation of the government as to its applicability.[22]

■ We have here a post-conviction commitment by court order to a hospital for treatment in a maximum security setting, and we address only the circumstances of this case. We conclude, considering the provisions of § 24–431 as a whole, that appellant was "in custody as a result of the offense"

under § 24–431(a) and hence is entitled to credit against the sentence imposed upon him by the trial court for the period of time spent at St. Elizabeths pursuant to the order committing him under the Sexual Psychopath Act. The case is remanded to the trial court so that a provision consistent with this opinion may be added to the sentencing order. See *supra* note 11.

*So ordered.*[23]

RANKIN, Associate Judge, dissenting:

The sole question that must be decided in this appeal is whether appellant's confinement at St. Elizabeths Hospital for· treatment pursuant to the Sexual Psychopath Act ("SPA") D.C.Code § 22–3503, *et seq.*, after he had pleaded guilty to criminal offenses but before he was sentenced, qualifies for credit against his sentence under the District of Columbia Good Time Credits Act of 1986 ("GTCA"), D.C.Code § 24–431.[1] It is a ques-

---

ment under the SPA, any more than any other *situation where a person might seek a lesser degree or a particular type of confinement permitted under the law. The issue is whether or not the proposed confinement qualifies for credit against the sentence, and both the Good Time Credits Act and the SPA suggest that the relevant considerations are objective in nature where a "court order" is involved.*

**22.** Most notably, specific clarification of the effect of pretrial commitments to hospitals by court order as part of the criminal process might have been thought necessary. We recognize that a respectable argument can be made to the contrary (*inclusio unius est exclusio alterius*), but the rule of lenity may not be entirely irrelevant in resolving the issue. *See Luck v. District of Columbia*, 617 A.2d 509, 515 (D.C.1992).

**23.** Based on our resolution of this case, we have no occasion to decide Shelton's equal protection claim.

**1.** There is in fact another issue raised by appellant which parallels this central issue, namely, whether the trial court was obliged under § 24–431(a), to decide the question of whether or not he was entitled to receive credit off his sentence for his time at the hospital. Although this issue was squarely presented to the court below at the sentencing hearing, the court declined to make the decision. Instead, the court stated that it would leave the decision to the Department of Corrections. *See supra,* note 8. Appellant contends that the trial court was compelled to decide the question rather than defer to the discretion of the Department of Corrections. I agree. · The

court was faced with a justiciable controversy involving a question of statutory interpretation of first impression. It is the duty of the judiciary to say what the law is. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Section 24–431(a) states "When entering the final order in any case, the court shall provide that the person be given credit for the time spent in custody. . . ." When it passed sentence and entered judgment, the court entered the final order. See *West v. United States*, 346 A.2d 504 (D.C.1975). In the routine case where the sole issue regarding credit is one of computation, the trial court's practice of leaving that task to the Department of Corrections is appropriate, because that agency is presumed to have accurate records of a person's pre-sentence confinement. This case was not routine and it was the judge's duty under the statute to decide whether appellant's confinement to the hospital comes within the scope of the GTCA. The majority acknowledges the court's "ultimate jurisdiction" to decide the dispute, *ante,* note 11; however, its disposition of the appeal avoids holding that the trial court erred in refusing to rule on the issue.

Appellant also half-heartedly raises a constitutional claim, contending that failure to credit his hospital time against his criminal sentence will result in a violation of his right to equal protection under the law. He argues that without the deduction his term of incarceration will exceed the maximum legal sentence. Appellant cites us to authorities that stand for the proposition that a person who is held in pre-sentence custody as a result of the conduct for which sentence is imposed, must be given credit for the pre-sentence custody. This proposition is fully consistent with

tion of statutory construction, therefore, applicable canons of construction must guide the analysis and the outcome. "When interpreting statutory language, this court gives effect to the plain meaning of the words and 'absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Zhou, et. al., v. Jennifer Mall Restaurant Inc.*, 699 A.2d 348, 351 (D.C.1997) (citing *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718, 726 (D.C.1994))(quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); moreover, "It is an elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute." 2A Norman J. Singer, Southerland Statutory Construction 46.06 (5th ed.1993). In my view, my colleagues in the majority have failed to adhere to these fundamental canons of construction in holding that appellant must receive credit against his sentence for the time that he was committed to the hospital. Instead, they have employed a methodology of construction which purports to achieve a legislative purpose by ignoring the plain meaning of statutory language and by eliminating certain language from the statute which, if given effect, would present a clear bar to the majority's holding. I must respectfully dissent.

The majority's opinion rests on their conclusion that § 24–431(a) and (c), read together, mean that a person who is adjudicated a sexual psychopath while criminal charges are pending, is in custody as a result of the offenses for which sentence is imposed because: (1) the evidence which underlies the offenses also comprises some part of the evidence that was considered in the SPA proceeding, and, (2) the commitment was for court ordered treatment. This conclusion is based on a strained and flawed legal analysis.

## I.

In part three of Judge Steadman's opinion, the reader will find a complete explication of the Sexual Psychopath Act as it relates to this appeal. The Act, though situated within the criminal code, is a self-contained chapter. It establishes a proceeding independent of any criminal proceeding, for the civil commitment for treatment, in a confined setting, of dangerous sexual predators. Anticipating that such uncontrollable and dangerous sexual proclivities will likely often result in criminal prosecutions, the authors of the Act included in its provisions a means for implementing civil commitment proceedings, not as an alternative or an adjunct, but in addition to and separate from the pending criminal case. If there is a criminal proceeding underway when the Act is triggered, that proceeding is automatically stayed until a disposition of the SPA proceeding is achieved. If the individual is found to be a sexual psychopath he is treated until either he no longer presents as a danger to others, or, until the statement which triggered the Act is withdrawn. Significantly, in the circumstances presented by this appeal, if the person is pending sentence, he must be delivered by the hospital to the court which has jurisdiction in the criminal matter, so that the court can proceed in the criminal case.

## II.

Prior to the enactment of the GTCA of 1986, the local jurisdiction had no codified grant of good time credit for pre-sentence custody, instead, the local practice simply followed federal law. The GTCA of 1986 was designed to be a comprehensive system for awarding good time credits to prisoners in custody and on parole. The statute established educational credits; meritorious credits; jail time and parole credits. It also established limits on the category of persons who are deemed eligible to receive good time

D.C. law as codified in § 24–431(a). Nevertheless, two jurisdictions have specifically held that confinement following a guilty plea under sexual predator statutes does not create an entitlement to credit against a subsequent criminal sentence. *Dorfman v. State*, 351 So.2d 954 (Fla.1977);

*State v. Newell*, 126 Vt. 525, 236 A.2d 656 (Vt. 1967). For reasons stated in the text, *infra*, appellant's confinement at St. Elizabeths was not as a result of the crimes for which he was sentenced, therefore, his equal protection argument has no merit.

credits. For example, educational and meritorious good time credits are not available to persons who are convicted of crimes of violence, § 24–429.2; and, in order to receive jail time credit on a sentence, the person must have been in custody as a result of the offenses for which the sentence was imposed. The phrase "as a result of the offense for which the sentence was imposed" is at the very core of § 24–431(a). It is the *sine qua non* for jail time credit and our duty is to find legislative intent in the language of the Act, *Zhou, supra,* 699 A.2d at 351. Arguably, one need look no further than the plain language of subsection (a) to see that credit against a criminal sentence for pre-sentence custody is available only to a person whose custody stemmed directly from the criminal charge[s]. If one finds ambiguity in the language of subsection(a), the recourse required by law is to examine the history of the Act in order to determine legislative purpose. While there is no recorded history that deals with the question before us, in *United States Parole Comm'n v. Noble,* 693 A.2d 1084 (D.C. 1997) ("*Noble I*") aff'd en banc, 711 A.2d 85 (D.C.1998) ("*Noble II*"), Judge Ferren, writing for the majority, collected some enlightening history of this Act. That history reflects the City Council's concern for public safety and sound public policy in the administration of criminal justice as it considered the language of various markups of the bill that was to become the GTCA of 1986. The court's *en banc* decision in *Noble* (*Noble II* ), though deciding a different question of interpretation of the GTCA, is nevertheless instructive on the point of legislative purpose. The holding in *Noble,* that a parolee whose parole is revoked does not receive credit against his sentence under § 24–431(a), was based on the court's view that the GTCA did not revoke by implication a longstanding prior law that barred such credit. *Noble*'s holding supports my reading of subsection (a) insofar as it recognizes reasonable limitations on the granting of good time credits. In my view, the majority cannot find support for its holding in the legislative history of the GTCA. The plain language of the Act and its legislative history indicate that a person who is in pre-sentence custody for reasons other than the offenses for which sentence is imposed, cannot receive good time credit for that period of confinement. *See Ali v. District of Columbia,* 612 A.2d 228, 230 (D.C. 1992). In my judgment, it is too clear for serious debate that appellant's confinement at John Howard Pavilion as a result of the SPA adjudication takes that period of custody outside the reach of the GTCA. The majority's claim of a "close relationship" between the SPA and criminal proceedings is an inadequate basis upon which to rest its holding; likewise, the fact that the SPA proceeding arose during the pendency of a criminal proceeding and that evidence of the charges in that case was a part of the evidence which led to appellant's commitment as a sexual psychopath, provides an insufficient rationale for holding that the GTCA applies to his case. The majority concedes as much but argues that § 24–431(c) resolves the issue in appellant's favor.

### III.

Section 24–431(c) provides:

> Any person who is sentenced to a term of confinement in a correctional facility or a hospital shall have deducted from the term all time actually spent, pursuant to a court order, by the person in a hospital for examination purposes or treatment prior to trial or pending an appeal.

As construed by the majority, this section should be read as follows:

> Any person who is sentenced to a term of confinement in a correctional facility or a hospital shall have deducted from the term all time actually spent, pursuant to a court, by the person in a hospital for examination purposes or treatment.

*Of course this construction, which seems to eliminate legislative words as mere verbiage, is only permissible if the language used by the City Council actually belies its legislative purpose, or, if application of the language would lead to absurd or inequitable results. See Duvall v. United States,* 676 A.2d 448 (D.C.1996); *Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983); *Mulky v. United States,* 451 A.2d 855, 857 (D.C.1982). Just as the majority's opinion acknowledges that Shelton really was not at

the Hospital as a result of the offenses for which he was sentenced, see *ante* at p. 610 and n. 18 ("To be sure, as a technical matter ... it is not the criminal acts themselves which form the basis for SPA commitment."), it likewise concedes that the plain language of this section renders it inapplicable to appellant's case, see *ante* at p. 610 ("It is true that the subsection does not literally cover the case before us...."). The GTCA is inapplicable to appellant's case under the plain meaning of the language of the Act; it is inapplicable by its legislative history; the remaining question in pursuing a statutory interpretation that is faithful to primary and general canons of construction is whether the plain reading leads to an absurd or inequitable result. *See Duvall, supra,* 676 A.2d at 452 (citing *Elm City Broadcasting Corp. v. United States,* 98 U.S.App.D.C. 314, 319, 235 F.2d 811, 816 (1956)).

I agree with the majority's view that appellant's tenacious determination, over government objection, to have the court order him to the Hospital as a sexual psychopath has no probative value on the question of whether he was in custody pursuant to court order. It does obviously carry some weight, however, in the determination of whether a decision to deny him good time credit leads to an inequitable or absurd result. In that regard, it is not only fair to consider that he was at the hospital at his own insistence, it is also fair to consider that when he grew tired of his confinement at the Hospital, and presumably, tired as well of his disagreements with the treatment team over the treatment regimen, he motioned the court to have the government withdraw the sexual psychopath statement. It is well to remember that the government never contended that a treatment program existed at the Hospital, which could reasonably be expected to cure appellant of his pedophilia.[2] The hospital was his idea and interrupting the due course of the criminal proceedings was entirely unnecessary to the prosecution of the criminal case.

In his motion to vacate his commitment as a sexual psychopath and to have the criminal case proceed, appellant made a curious reference to his confinement to the hospital as an "alternate sentencing structure." There is no other indication in the record that this commitment was perceived by the parties or the court as a sentencing alternative. Of course, a sentencing alternative, in the vernacular of the criminal law, means an alternative to incarceration, usually imposed as a condition of probation upon entry of sentence and final judgment. This period of confinement at the Hospital was not an alternate sentencing structure; it was a civil commitment of a sexual psychopath, independent of his criminal prosecution. Because he had pleaded guilty, he was neither pending trial nor pending appeal. Fundamental rules of statutory construction inevitably lead to the conclusion that the GTCA does not apply to his sentence.

---

2. Mental health professionals as well as corrections' professionals have found the search for an effective treatment regimen for child molesters to be elusive. *See* for example: United States Department of Justice National Institute of Corrections, *Questions and Answers On Issues Related to* the *Incarcerated Male Sex Offender* (1988); Kim English, "Does Sex Offender Treatment Work? Why Answering This Question is So Difficult;" "Managing Adult Sex Offenders in the Community—A Containment Approach," American Probation and Parole Association (January 1996).