*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 15-CO-38 & 15-CO-240

DONNELL TILLEY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(CF1-5845-09)

(Hon. William M. Jackson, Trial Judge)

(Argued September 27, 2017            Decided   October 1, 2020)

*Adam G. Thompson*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant.

*James A. Ewing*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Colleen Kennedy*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

Opinion for the court by *Associate Judge* GLICKMAN.

Dissenting opinion by *Associate Judge* THOMPSON at page 39.

GLICKMAN, *Associate Judge*:    Donnell Tilley appeals an order of the Superior Court civilly committing him indefinitely to St. Elizabeths Hospital, a mental institution, under the District of Columbia's seventy-year-old Sexual Psychopath Act (the SPA).[1]  Mr. Tilley contends that his commitment – which was not based on any finding of a dangerous mental illness, mental disorder, or other mental abnormality – must be vacated because the SPA is unconstitutional both on its face and as applied to him, and because the evidence did not support the finding that he is a "sexual psychopath" within the meaning of the SPA.

The SPA provides for the involuntary, indefinite civil confinement in a mental institution of persons who are "not insane" but are thought to be too dangerous to remain at large based on their "course of repeated misconduct in sexual matters."[2]  The statute provides for confinement of such persons as "sexual psychopaths" without proof that they have any mental disorder or abnormality; instead, "not insane" has been construed to impose the condition that they *not* be mentally ill.  For this and other reasons, the SPA's constitutionality has long been

---

[1]  D.C. Code § 22-3803 *et seq.* (2012 Repl.).  Mr. Tilley also noted an appeal from a supplemental order that provided for him to be re-evaluated for annual court reviews of his commitment.  This court consolidated the two appeals *sua sponte*.

[2]  *Id.* § 22-3803(1).

in doubt; fifty years ago, the United States Court of Appeals for the District of Columbia Circuit observed that the preventive-detention nature of the SPA posed "constitutional issues of the gravest magnitude."[3]  Until now, however, because of the rarity of commitment proceedings under the SPA, the question of its constitutionality did not come before this court.  But the Supreme Court resolved the main issue two decades ago when it held that, to comport with substantive due process, civil commitment of dangerous sex offenders must be limited to those who suffer from a mental disease, mental disorder, or mental abnormality that makes it seriously difficult for them to control their dangerous behavior and be responsible for their sexual misconduct.  Based on that precedent, we conclude that the SPA is unconstitutional on its face for the reason that it requires no finding in any case of a mental disease, disorder, or abnormality causing such serious impairment of sex offenders' ability to control their behavior.

Because we agree that the SPA is unconstitutional on its face, we do not reach Mr. Tilley's other claims.

---

[3] *Millard v. Harris*, 406 F.2d 964, 973 (D.C. Cir. 1968).

## I.

On March 13, 2009, the United States charged Mr. Tilley by criminal complaint in Superior Court with one count of first-degree child sexual abuse[4] of his daughter, V.W. After a court-ordered screening, the court found Mr. Tilley incompetent to stand trial and committed him to St. Elizabeths Hospital for treatment to "restore" him to competency. Seventeen months later, after Hospital psychiatrists concluded that Mr. Tilley was intellectually disabled and that further competency treatment would be futile, the court scheduled a *Jackson* hearing pursuant to D.C. Code § 24-531.06 (2012 Repl.).[5] Had that hearing been held, and if the court had found that Mr. Tilley would be unlikely to attain competency in the foreseeable future, then § 24-531.06(c)(4) would have required the court to release him unless the government promptly petitioned for his civil commitment on

---

[4] D.C. Code § 22-3008 (2012 Repl. & 2020 Supp.).

[5] *Jackson v. Indiana*, 406 U.S. 715 (1972), held that a criminal defendant may be committed to a mental institution for the purpose of restoring his competency only for "the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Id.* at 738. At the end of that time period, a hearing is normally held to determine whether further efforts to bring the defendant to competency would be futile. If the court finds that to be so, then the state "must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant." *Id.*

grounds of dangerousness due to mental illness or intellectual disability pursuant to either the Hospitalization of Persons with Mental Illness Act (commonly referred to as the Ervin Act)[6] or the Citizens with Intellectual Disabilities Act.[7] Section 24-531.06 does not mention the SPA as providing an alternative civil commitment procedure the government may pursue when a criminal defendant is found to be incompetent.

Mr. Tilley's scheduled *Jackson* hearing was not held, however, and the court made no determination as to his continuing incompetency to stand trial. Instead, in February 2011, the government filed with the court a statement initiating a proceeding to commit Mr. Tilley under the SPA as a sexual psychopath.[8] The filing of the statement automatically stayed the criminal proceeding against Mr. Tilley.[9]

---

[6] *See* D.C. Code § 21-541 *et seq.* (2012 Repl.).

[7] *See* D.C. Code §§ 7-1303.04(b-1), -1304.06a (2018 Repl. & 2020 Supp.).

[8] *See* D.C. Code § 22-3804(b).

[9] *Id.* § 22-3810. The government expressly "does not concede either that [Mr. Tilley] was in fact incompetent at the time of his SPA hearing or that he would be deemed incompetent at any future *Jackson* hearing."

The SPA defines a "sexual psychopath" as "a person, not insane, who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his or her sexual impulses as to be dangerous to other persons because he or she is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his or her desire."[10]  The term "sexual psychopath" is not itself a term with a recognized psychiatric or psychological meaning, and its statutory definition does not require a finding of any kind of mental disease, disorder, or abnormality. Rather, as discussed more fully below, the statutory "not insane" condition has been authoritatively construed to require, among other things, a finding that the person is "*not* mentally ill," with the understanding that "mental illness" is accorded "a liberal construction" coextensive with the scope of that term in the Ervin Act.[11]  In other words, a person cannot be committed under the SPA if that person's dangerous "lack of power to control his or her sexual impulses" is attributable to mental illness (broadly defined).  By its terms, the SPA predicates the "lack of control" finding solely on the "course of repeated misconduct in sexual matters" and not on any disabling mental condition.

---

[10]  *Id.* § 22-3803(1).

[11]  *Millard*, 406 F.2d at 968, 971 (emphasis added).

The government's February 2011 statement alleged that Mr. Tilley had sexually abused his daughter V.W. on multiple occasions, including the March 2009 incident charged in the indictment. It further alleged that Mr. Tilley previously had abused two other young girls, A.T. and L.T., in 1996, and A.T. again in 1998.[12] In accordance with the procedures outlined in the SPA, the court appointed two psychiatrists to examine Mr. Tilley and evaluate "whether the patient is a sexual psychopath."[13] In July 2012, the psychiatrists – Dr. Robert T.M. Phillips and Dr. Raymond Patterson – submitted reports concluding that Mr. Tilley was not insane and that he met the statutory criteria for being a sexual psychopath. Upon receiving these reports, the court scheduled an evidentiary hearing on the issue.[14] Prior to the hearing, the government amended its statement to add a charge that Mr. Tilley had abused a young boy, M.C., between 2001 and 2003.

---

[12] The 1998 allegation was the subject of a misdemeanor charge against Mr. Tilley in 1999, which the government dismissed in 2001.

[13] D.C. Code § 22-3806(a). The SPA refers to an alleged sexual psychopath as the "patient." *Id.* § 22-3803(3). Although the SPA requires that two psychiatrists examine the "patient" and report their conclusions as to whether he is a sexual psychopath, the statute does not require that the psychiatrists diagnose him with any mental illness, disorder, abnormality, or condition of any kind. Rather, to conclude that the subject is a sexual psychopath, the psychiatrists must conclude that he is not "insane" and hence is *not* mentally ill.

[14] *See id.* § 22-3807 (requiring a hearing if both psychiatrists state that the patient is a sexual psychopath).

The SPA hearing began on February 22, 2013. Collectively, the four identified victims testified that Mr. Tilley had sexually assaulted them on multiple occasions between 1996 and 2009. Their testimony was corroborated by family members and other witnesses. Based on this evidence, the court found the following facts, which Mr. Tilley disputed below but does not dispute in this appeal. First, on an evening in 1996, Mr. Tilley sexually assaulted nine-year-old A.T. and her cousin, ten-year-old L.T. This incident occurred at their grandmother's house while the girls were sleeping; Mr. Tilley was a family friend whom the children referred to as a "cousin." Second, Mr. Tilley again sexually assaulted A.T. one or two years later. This incident also took place at the grandmother's residence. Third, on multiple occasions between 1997 and 2003, Mr. Tilley sexually assaulted M.C., who was born in 1994. During this period, Mr. Tilley was living with M.C. and his family. Fourth, Mr. Tilley raped his 14-year-old daughter, V.W., while she was visiting him in March 2009.

To establish that Mr. Tilley was a sexual psychopath based on this history of child molestation, the government presented the testimony of the two psychiatrists who had evaluated him.

Dr. Phillips opined that Mr. Tilley met the criteria for being a sexual psychopath because (1) he did not suffer from a psychosis or other mental illness ("a diagnosis on Axis One"[15]) and therefore was "not insane" within the meaning of the SPA; and (2) the "pattern" of past sexually abusive behavior shown by the "four allegations" against Mr. Tilley "support[ed] the notion of repetition, compulsion and inability to control the impulse, and the subsequent risk . . . to the individuals who are the subject of those actions."

Although Mr. Tilley's IQ testing showed him to have a "mild" intellectual disability, Dr. Phillips said he could not conclude that Mr. Tilley's sexually abusive behavior was a "byproduct" of that disability. Dr. Phillips noted that Mr. Tilley "accommodates very well" and his "functional capacities are certainly . . . on the higher end of that diagnosis." Dr. Phillips also was not persuaded that Mr.

---

[15] Under the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. rev. 2000) [hereinafter, "DSM-IV"], which was current at the time of the doctors' testimony, Axis I referred to all the various clinical disorders and other conditions that may be the focus of clinical attention except personality disorders and what was then referred to as mental retardation, which were listed on Axis II. *See* DSM-IV at 27-28. DSM-IV cautioned that "[t]he coding of Personality Disorders on Axis II should not be taken to imply that their pathogenesis or range of appropriate treatment is fundamentally different from that for the disorders coded on Axis I." *Id.* at 28. The next edition of the Manual, issued in 2013, dropped the multiaxial coding system altogether. *See* American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

Tilley met the criteria for a diagnosis of pedophilia, which he said was a personality disorder rather than an Axis I mental illness.[16] But Dr. Phillips considered the "debate" about whether Mr. Tilley had a pedophilic disorder to be "irrelevant" to the issue at hand because the SPA "does not require a finding of pedophilia;" it "really is focused," he said, "on whether or not there's an Axis One diagnosis [which would preclude a sexual psychopathy finding], and whether or not this individual is engaged in repetitive behavior which cannot be controlled." In other words, Dr. Phillips found Mr. Tilley to be a sexual psychopath solely because Mr. Tilley does not suffer from what he considered to be a mental illness for SPA purposes and "his behaviors comport with the statutory scheme." As Dr. Phillips emphasized, "sexual psychopath" is "not a psychiatric diagnosis at all."

---

[16] Dr. Phillips was mistaken about the axial classification of pedophilia. In actuality, DSM-IV listed pedophilia and other paraphilias on Axis I, and not with the personality disorders on Axis II. *See* DSM-IV, *supra* note 15, at 28; *see also, e.g.*, *United States v. Irey*, 612 F.3d 1160, 1199 n.27 (11th Cir. 2010) ("Under the DSM IV TR, pedophilia is a paraphilia and an Axis I disorder."); *State v. R.D.G.*, 66 P.3d 560, 563 (Or. Ct. App. 2003) ("The mental health professionals disagreed . . . as to whether paraphilias properly should be classified as mental disorders. Paraphilias are 'Axis I' diagnoses in the [DSM-IV (4th ed. 1994)]."). It should be noted, however, that the DSM-IV classification of pedophilia as an Axis I disorder does not mean Dr. Phillips erred in stating that pedophilia is not a mental illness. In fact, the parties on appeal dispute whether pedophilia should be viewed as a mental illness for Ervin Act purposes. This is not a dispute we are prepared to resolve as a matter of law. But the question need not concern us in this case, as it does not affect our holding that the SPA is unconstitutional on its face and cannot be applied to Mr. Tilley.

Dr. Patterson's testimony generally agreed with that of Dr. Phillips, except that in Dr. Patterson's opinion, Mr. Tilley did meet the diagnostic criteria for pedophilia as well as the criteria for mild intellectual disability.[17] Nonetheless, in Dr. Patterson's opinion, Mr. Tilley met the criteria for commitment under the SPA because he was "not insane"[18] and his repeated acts of child sexual abuse amounted to a "pattern of conduct" demonstrating a "high" risk of continuing to inflict great harm on children if he were to be released. The risk was heightened because Mr. Tilley was "opportunistic" and was not uncomfortable with, or motivated to change, his predatory behavior. Dr. Patterson did not testify that Mr. Tilley's pedophilic disorder impaired his ability to control his sexual impulses. He explained that while "[p]art of the issue is impulse control," that does not mean pedophiles lack the power to control their sexual impulses.[19]

---

[17] Dr. Patterson "emphasize[d]" that Mr. Tilley's "mental retardation" is "mild" and that he is "quite functional."

[18] Like Dr. Phillips, Dr. Patterson was of the mistaken view that pedophilia was not an Axis I diagnosis in DSM-IV.

[19] "But if all pedophiles . . . have total lack of control," Dr. Patterson testified, "then any time . . . they see a child they'd run over and grab the child. That's not what happens. They plan, they scheme. They take advantage of opportunistic situations . . . ."

Based on the psychiatrists' testimony (which the court for the most part credited) and the multiple incidents of child sexual abuse the government had proved, the court found by clear and convincing evidence that Mr. Tilley is a sexual psychopath. Specifically, the court concluded that (1) Mr. Tilley is "not insane" because he did not have a mental illness, and though he "suffers from a mild intellectual disability and possibly pedophilia, [he] nonetheless functions fairly well in society despite his cognitive limitations"[20]; (2) Mr. Tilley had "engaged in a course of repeated sexual misconduct, which evinces an inability to control his impulses"; (3) Mr. Tilley's "prior sexual abuse of A.T., L.T., M.C., and V.W. demonstrates that he cannot control his deviant sexual impulses," indicating a "high risk of re-offending" if he were not confined[21]; and (4) if Mr. Tilley were to continue to abuse children, the "magnitude" of the expected psychological harm to those children would be "substantial" and "devastating."

Having found Mr. Tilley to be a sexual psychopath, the court ordered that he be committed to St. Elizabeths Hospital until he has "sufficiently recovered so as

---

[20] As indicated by its use of the word "possibly," the court did not find that Mr. Tilley suffers from pedophilia.

[21] The court added that the risk shown by Mr. Tilley's "pattern of sexual deviancy" was exacerbated by his "persistent denials of having engaged in any sexual misconduct and his refusals to participate in treatment."

to not be dangerous to other persons."[22]  The court declared that it would review this commitment on an annual basis to determine whether Mr. Tilley can continue to be confined pursuant to the SPA.[23]

## II.

Mr. Tilley argues that, on its face, the SPA violates substantive due process by authorizing civil commitment of sexually dangerous persons without a finding that a mental disease, disorder, or abnormality prevents or impedes them from controlling their dangerous behavior.  The United States agrees that such a finding is constitutionally required, but it argues that the SPA satisfies this requirement because its definition of a "sexual psychopath" calls for a finding that the person's behavior evidences a "lack of power to control" his or her dangerous sexual impulses.

Mr. Tilley did not raise his substantive due process challenge to the facial constitutionality of the SPA in the Superior Court; he presents it for the first time

---

[22]  D.C. Code § 22-3809.

[23]  The stay of the criminal proceeding against Mr. Tilley remains in effect until he is discharged from confinement, at which point his prosecution could be resumed.  *See id.* § 22-3810.

in this appeal. Normally, a claim that was not raised or passed on in the trial court will be "spurned" on appeal.[24] This principle is "one of discretion rather than jurisdiction," however.[25] "[I]n 'exceptional situations and when necessary to prevent a clear miscarriage of justice apparent from the record,' we may deviate from the usual rule that our review is limited to issues that were properly preserved. . . . [We have] discretion, in the interests of justice, to consider an argument that is raised for the first time on appeal if the issue is purely one of law, particularly if the factual record is complete and a remand for further factual development would serve no purpose, the issue has been fully briefed, and no party will be unfairly prejudiced."[26] We are satisfied that Mr. Tilley's present constitutional challenge to the SPA meets all those preconditions.[27]

---

[24] *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C. 1988) (quoting *Miller v. Avirom*, 384 F.2d 319, 321-22 (D.C. Cir. 1967)). This is not a situation where the appellant seeks to resurrect on appeal a claim he affirmatively waived below.

[25] *District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 34 n.3 (D.C. 2001).

[26] *Id.* (quoting *Williams v. Gerstenfeld*, 514 A.2d 1172, 1177 (D.C. 1986)). The government argues that if Mr. Tilley's unpreserved constitutional challenge to the SPA is not waived, it is reviewable only under the four-part test for plain error applicable in criminal appeals. *See, e.g.*, *Kinane v. United States*, 12 A.3d 23, 26 (D.C. 2011) ("Where, as here, appellants fail to object to the constitutionality of [the statute] during the trial court proceedings, this court reviews appellants' claim for plain error."). But since "proceedings under the SPA [are] 'civil' in nature," *Shelton v. United States*, 721 A.2d 603, 608 (D.C. 1998) (citation omitted), we view this as a civil appeal, in which relief may be granted on an unpreserved claim
*(continued…)*

This is indeed an exceptional case. The unconstitutional commitment of a person to a mental institution for what could be the rest of his or her life is unquestionably a clear miscarriage of justice. The issue of the SPA's facial unconstitutionality is a pure question of law. No further factual development is needed to answer that question. The parties have fully briefed the legal issue. No party will be unfairly prejudiced if we decide it at this time. We shall do so.

The challenge, it must be understood, is to the statute's constitutionality on its face, which is to say, in all its applications and not merely as it has been applied to Mr. Tilley.[28] To prevail, he "must demonstrate that the terms of the statute, measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain[] a constitutional infirmity that

---

*(continued…)*
that does not satisfy the plain error test, *see In re Ta.L.*, 149 A.3d 1060, 1073 n.11 (D.C. 2016) (en banc).

[27] *See, e.g.*, *Biotechpharma, LLC v. Ludwig & Robinson, PLLC*, 98 A.3d 986, 994 (D.C. 2014) (exercising discretion to consider unpreserved legal challenges to the validity and constitutionality of a Bar Rule promulgated by this court); *Pajic v. Foote Props., LLC*, 72 A.3d 140, 145-46 (D.C. 2013) (reviewing unpreserved challenge to legality of contract provision).

[28] *See Conley v. United States*, 79 A.3d 270, 276-77 (D.C. 2013).

invalidates the statute in its entirety."[29]  If Mr. Tilley shows that the SPA "fails to require the government to prove everything the Constitution requires it to prove for [civil commitment] to be imposed . . . , and if the legislative design and the limits of the judicial function do not permit us to read the critical missing elements into the statute, then [Mr. Tilley] has carried his burden of showing that every application of [the SPA] is unconstitutional – even if a validly written statute could have reached [his] particular conduct [and authorized his civil commitment]."[30]

## A. The SPA – Context, History, and Interpretation

The SPA was enacted in 1948.[31]  It was part of a "wave" of sexual psychopath commitment legislation in this country that began in the 1930s.[32]  By defining "sexual psychopaths" as persons whose repeated misconduct evidences their dangerous lack of power to control their sexual impulses, Congress employed

---

[29] *Id.* at 277 (internal quotation marks and footnote omitted).

[30] *Id.*

[31] The Sexual Psychopath Act, ch. 428, title II, §§ 201-209, 62 Stat. 347-48 (1948).

[32] *See* Tamara Rice Lave, *Only Yesterday:  The Rise and Fall of Twentieth Century Sexual Psychopath Laws*, 69 La. L. Rev. 549, 549 (2009); *see also* Deirdre M. Smith, *Dangerous Diagnoses, Risky Assumptions, and the Failed Experiment of "Sexually Violent Predator" Commitment*, 67 Okla. L. Rev. 619, 627 (2015).

substantially the same terminology that the Supreme Court had upheld in 1940 against a vagueness challenge to a similar Minnesota statute, except that Congress added the specific exclusion of "insane" persons (who were subject to civil commitment in the District of Columbia under a different statute).[33] At the time of the SPA's enactment, the Dictionary Act defined the word "insane" to "include every idiot, non compos, lunatic, and insane person."[34] The Supreme Court did not have occasion to consider the import of such an exclusion in its 1940 decision because the SPA's constitutionality was not before it; nor did the Court address

---

[33] *See* H.R. Rep. No. 1787, 80th Cong., 2d Session at 4 (1948) ("The constitutionality of this type of statute has been upheld by the Supreme Court of the United States in [*Minnesota ex rel. Pearson v. Probate Court of Ramsey County*, 309 U.S. 270 (1940)]."). As construed by the state's highest court, the Minnesota "psychopathic personality" statute applied to "those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire." *Minnesota ex rel. Pearson*, 309 U.S. at 273 (quotation marks omitted). This construction of the statute, the Supreme Court held, "destroys the contention that it is too vague and indefinite to constitute valid legislation," because the "underlying conditions, calling for evidence of past conduct pointing to probable consequences, are as susceptible of proof as many of the criteria constantly applied in prosecutions for crime." *Id.* at 274.

[34] Act of July 30, 1947, ch. 388, § 1, 61 Stat. 633. (As subsequently amended, the word "lunatic" has been dropped and "non compos" has become "non compos mentis." *See* 1 U.S.C. § 1 (2018).). Thus, from the outset, severely intellectually disabled persons also have been among those persons excluded from the definition of "sexual psychopath."

whether the Minnesota statute satisfied the requirements of substantive due process.

Congress enacted the Ervin Act in 1965.[35] It allows for the civil commitment of a person who is found by the court to be "mentally ill and, because of that mental illness, is likely to injure himself or others if not committed."[36] The Ervin Act does not exclude sexually dangerous individuals from its purview if their dangerousness to others is attributable to a mental illness. It defines "mental illness" broadly as "a psychosis or other disease which substantially impairs the mental health of a person."[37] Both this court and the District of Columbia Circuit have accorded this definition "a liberal construction" and said it "encompass[es] a broad variety of mental ills," including virtually any "abnormal mental condition for which medical treatment is felt to be appropriate."[38]

---

[35] Pub. L. 89-183, Title 21, ch. 5, §§ 21-501 *et seq.*, 79 Stat. 750 (1965).

[36] D.C. Code § 21-545(b)(2) (2012 Repl.). The general civil commitment law in effect in the District of Columbia prior to the Ervin Act applied only to persons who were "insane." *See* Act of Aug. 9, 1939, ch. 620, § 6, 53 Stat. 1296 (repealed 1964).

[37] D.C. Code § 21-501(5) (2020 Supp.).

[38] *In re Rosell*, 547 A.2d 180, 183 (D.C. 1988) (quoting *Millard*, 406 F.2d at 968); *see also id.* at 182 (explaining that suicidal appellant's diagnosis of "an adjustment disorder with depressed mood and a borderline personality disorder"

*(continued…)*

Intellectual disability is not encompassed by the Ervin Act's definition of mental illness.[39] However, the subsequently enacted Citizens with Intellectual Disabilities Act provides, in pertinent part, that when an individual charged with a crime of violence or sex offense is found to be incompetent based on "at least a mild intellectual disability," the District may petition the court to commit the individual to an appropriate facility after an evidentiary hearing and a finding that the individual "is likely to cause injury to others as a result of the individual's intellectual disability if allowed to remain at liberty."[40]

---

*(continued…)*
qualified her as "mentally ill" for the purpose of involuntary emergency hospitalization under the Ervin Act).

[39] *In re Alexander*, 372 F.2d 925, 927 (D.C. Cir. 1967) ("[I]t is not enough to commit a person under the [Ervin] Act to find that he is mentally deficient, even when such condition is accompanied by some antisocial behavior.").

[40] *See* D.C. Code §§ 7-1301.03(14C) (defining "Individual found incompetent in a criminal case"), -1303.04(b-1) (District's petition to commit incompetent criminal defendant), -1304.06a(d) (finding by court). "Intellectual disability" is defined for these purposes as a "substantial limitation in capacity that manifests before 18 years of age and is characterized by significantly below-average functioning, existing concurrently with 2 or more significant limitations in adaptive functioning." *Id.* § 7-1301.03(15A). "'Cause injury to others as a result of the individual's intellectual disability' means cause injury to others as a result of deficits in adaptive functioning associated with an intellectual disability." *Id.* § 7-1301.03(2C).

In 1968, the District of Columbia Circuit concluded in *Millard* that "serious problems of equal protection would arise" if the government could deprive some mentally ill persons of the Ervin Act's procedural protections by pursuing their commitment instead under the (less procedurally protective) SPA.[41] To avoid those constitutional problems, the court held that "we must construe the words 'not insane' in the sexual psychopath statute to mean 'not mentally ill'" within the meaning of the Ervin Act.[42] Under this holding, a person can be committed under the SPA only if it is proved that the person does *not* have "a psychosis or other disease which substantially impairs the mental health of [the] person."[43] *Millard*'s holding is binding on this court,[44] and we have adhered to it in the past.[45] Notably, in *Hughes v. United States*, where two psychiatrists reported that Mr. Hughes suffered from "a mental disorder, namely, Sexual deviation, sadism, severe," we

---

[41] 406 F.2d at 970 (citing *Baxstrom v. Herold*, 383 U.S. 107 (1966)).

[42] *Id.* at 971.

[43] *Id.* at 968 (citation omitted). To comply with the statutory definition of "insane," it also must be proved that the person is not so seriously impaired cognitively as to be deemed an "idiot" or "non compos mentis."

[44] *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) (stating that decisions of the District of Columbia Circuit rendered prior to February 1, 1971, "constitute the case law of the District of Columbia").

[45] *See Shelton*, 721 A.2d at 608 ("[T]he SPA, in excepting those 'insane' from its reach, effectively excludes all those deemed 'mentally ill.'").

held that he was ineligible for commitment under the SPA because the reports indicated "quite clearly that [he was] mentally ill."[46]

But if the *Millard* court's construction of the SPA avoided equal protection problems, it exposed the constitutional vulnerability of the statute on other, more fundamental grounds. One problem, the court noted, is that "[w]hen 'insane' is read to mean 'mentally ill' in the broad sense that term has come to be used in the statutes and court decisions of this jurisdiction, a serious question arises whether its language [i.e., the definition of a 'sexual psychopath'] is not so meaningless or self-contradictory as to be constitutionally infirm."[47] This would be the case, the court pointed out, if *any* person whose pattern of sexual misconduct meets the statutory definition of a sexual psychopath by showing a dangerous lack of power to control his sexual impulses is, *ipso facto*, "mentally ill in the broad sense" and therefore outside the statutory definition.[48] Having identified this possible

---

[46] 308 A.2d 238, 241 (D.C. 1973).

[47] *Millard*, 406 F.2d at 972.

[48] *Id.* Otherwise put, the SPA would be "meaningless" if "the intersection of the class of dangerous sexual recidivists and the class of not mentally ill persons is the null set – i.e., . . . there is no person who is a dangerous sexual recidivist but who is not mentally ill." *Id.* In his concurring opinion, Judge Wright put the question more succinctly: "is the sex psychopath described in the District of Columbia statute mentally ill as a matter of law and therefore outside the coverage

*(continued…)*

problem, the court said it was "reluctant" to draw such a "sweeping" conclusion about the SPA in the case at hand, and it refrained from doing so. It assumed provisionally that it might be possible (though the court did not see how) for a person to be a sexual psychopath within the meaning of the SPA but not be mentally ill within the meaning of the Ervin Act.[49]

Yet this only forced the court to acknowledge the serious substantive due process issue presented by the SPA, which it explained as follows:

> [W]hen "not insane" is read to mean "not mentally ill" the sole justification for commitment under the sexual psychopath statute is [the committee's] dangerousness to others. Since that is true, we must view the statute realistically as one which borders close upon preventive detention – detention which under our statute does not even require prior conviction of a criminal act.[50]

---

*(continued…)*
of the Act?" *Id.* at 980-81 (Wright, J., concurring). He concluded that the SPA does indeed "suffer[] from a self-destructive internal contradiction – a sex psychopath as defined therein must of necessity be mentally ill – which renders it unenforceable." *Id.* at 985.

[49] *Id.* at 972 (majority opinion); *see also Cross v. Harris*, 418 F.2d 1095, 1099 (D.C. Cir. 1969) ("Under *Millard*, it remains for future cases to show whether there are in fact any dangerous sexual recidivists who are not 'mentally ill' within the broad meaning of the [Ervin] Act.").

[50] *Millard*, 406 F.2d at 973.

"When the statute is evaluated in that light," the court said, "constitutional issues of the gravest magnitude immediately appear."[51]  As a substantive matter, there was "a serious question" whether the state ever can commit a person to a mental hospital against his will, "not because he is mentally ill[,] but only because his past conduct allegedly demonstrates his likely dangerousness" in the future.[52]  And even if this were permissible, the court had "great difficulty imagining" how it could be done without "the full protection" of the constitutional rights of defendants in criminal trials.[53]

Here too, though, the *Millard* court refrained from deciding whether the SPA could pass constitutional muster.  The court found it unnecessary to reach the substantive due process issue because Mr. Millard was not a violent sexual offender, and the evidence showed he was unlikely to engage in any sexual misconduct other than exhibitionism.  This allowed the court to conclude that Mr. Millard had met his burden of showing he was "not sufficiently likely to cause the

---

[51] *Id.*

[52] *Id.*

[53] *Id.*

sort of harm required by the statute to justify further commitment" (and hence was not a sexual psychopath for that reason).[54]

So the D.C. Circuit did not strike down the SPA, and its clear warning that the statute appeared to raise "constitutional issues of the gravest magnitude" went unheeded for the next fifty years – even as most of the first generation sexual psychopath statutes in other jurisdictions "faced widespread criticism . . . . [and] were either repealed or no longer used by the early 1980s."[55] But with the availability of the Ervin Act, the SPA, too, descended into a state of prolonged desuetude. It appears that the SPA rarely has been employed since *Millard* to

---

[54] *Id.* at 978.

[55] Smith, *supra* note 32, at 627-28. In brief:

> A growing number of commentators within psychiatry attacked the "sexual psychopath" legal classification, as there was no agreed-upon definition or basis to attach this label to any individual. Moreover, it became clear that many of these hospitalized men were not mentally ill and received little, if any, treatment in these hospitals. The laws were little more than extended detention on a preventive basis.

*Id.* (footnotes omitted); *see also* 1 Michael L. Perlin & Heather Ellis Cucolo, *Mental Disability Law: Civil and Criminal* [hereinafter, "Perlin"], § 5-2.2, p. 5-45 n.225 (3d ed. 2018) ("Any remaining laws fell into disuse and half-way into the decade from 1980 to 1990, only five states . . . still applied their [sexual psychopath] law with any appreciable frequency."); Lave, *supra* note 32, at 579-89.

commit a person against his or her will. Until now, in the past half century, this court has dealt with a committed "sexual psychopath" in only one published opinion – and that was a case in which the commitment was not involuntary at all, but rather was at the behest of the "patient" himself over the government's objection.[56]

## B. The Requirements of Substantive Due Process

The Supreme Court has not had occasion to consider the constitutionality of the District of Columbia's SPA. But as the Court said in *Addington v. Texas*,[57] it "has repeatedly recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."[58] Traditionally, and as a condition of substantive due process, civil commitment statutes throughout the United States have required a dual finding of mental illness and resultant dangerousness (to self or others).[59] In *O'Connor v. Donaldson*,[60] the

---

[56] *Shelton*, 721 A.2d at 604. The only issue presented in this appeal was whether Mr. Shelton was entitled to receive credit against his criminal sentence for the time he spent confined under the SPA. *Id.*

[57] 441 U.S. 418 (1979).

[58] *Id.* at 425.

[59] *See* Perlin, *supra* note 55, § 3-1.

Court held that "[a] finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. . . . [T]here is . . . no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom."[61] In *Foucha v. Louisiana*,[62] the Court confirmed that the converse is also true: future dangerousness by itself cannot justify the indefinite civil confinement in a mental institution of someone who is not, or is no longer, mentally ill.[63] And *Addington* held that the Due Process Clause requires both

---

*(continued...)*

[60] 422 U.S. 563 (1975).

[61] *Id.* at 575.

[62] 504 U.S. 71 (1992).

[63] *Id.* at 83. Mr. Foucha was committed to a psychiatric hospital under Louisiana law after a criminal trial in which he was found not guilty by reason of insanity. Under *Jones v. United States*, 463 U.S. 354 (1983), it properly could be inferred that at the time of the verdict, Foucha was still mentally ill and dangerous and hence could be committed. *Foucha*, 504 U.S. at 76. State law barred Foucha's release until he could prove he was no longer dangerous, even when he concededly was no longer mentally ill. *Id.* at 75. Despite Foucha's continuing dangerousness, the Court held that Foucha could be held only "as long as he is both mentally ill and dangerous, but no longer," *id.* at 77, and that "keeping [him] against his will in a mental institution [was] improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." *Id*. at 78.

statutory preconditions – mental illness and dangerousness – to be proved by (at least) clear and convincing evidence.[64]

In a later case, *Kansas v. Hendricks*,[65] the Supreme Court clarified that the Due Process Clause allows the civil commitment of persons who are not categorized by psychiatrists as "mentally ill" if they are found to be dangerous due to other seriously disabling mental abnormalities or disorders. In so holding, the Court adhered to the basic substantive due process principle that civil commitment requires proof of a serious mental impairment of some kind in addition to dangerousness as a result thereof. The question, as the Court explained, is not the nomenclature used to describe the mental impairment, or the mere existence of a mental impairment *per se*, but its substantial adverse impact on the person's ability to control his or her dangerous behavior. Specifically, the Court held that substantive due process requires proof of a mental illness, disorder, or abnormality "that makes it difficult, if not impossible, for the person to control his behavior."[66]

---

[64]  *Addington*, 441 U.S. at 433.

[65]  521 U.S. 346 (1997).

[66]  *Id.* at 358.

The statute before the Court in *Hendricks* was Kansas's recently enacted Sexually Violent Predator Act (the "SVPA").[67] It provided for the involuntary civil commitment of "any person who has been convicted of or charged with a sexually violent offense and who suffers from *a mental abnormality or personality disorder* which makes the person likely to engage in . . . predatory acts of sexual violence."[68] A "mental abnormality" was statutorily defined to mean "a congenital or acquired condition *affecting* the emotional or volitional *capacity* which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others."[69] The SVPA did not require a finding of a "mental illness."[70] Mr. Hendricks was involuntarily

---

[67] Beginning in 1990, following the virtual demise of the old sexual psychopath statutes, a number of states enacted a second generation of statutes providing for the civil commitment of persons commonly described as "sexually violent predators." *See* Perlin, *supra* note 55, §§ 5-2.2, 5-2.3. In contrast to prior statutes, the new statutes expressly authorized civil commitment for persons found to be sexually dangerous due to mental abnormalities or disorders other than mental illness.

[68] Kan. Stat. Ann. § 59-29a02(a) (1994) (emphasis added). This is the original statutory definition of the term "sexually violent predator." The definition later was amended; it now contains the additional requirement that the person must have "serious difficulty in controlling such person's dangerous behavior." Kan. Stat. Ann. § 59-29a02(a) (2018). It appears that this requirement was added in response to *Hendricks* and the subsequent decision of the Supreme Court in *Kansas v. Crane*, 534 U.S. 407 (2002), which is discussed below.

[69] Kan. Stat. Ann. § 59-29a02(b) (1994) (emphasis added). The statute did not define "personality disorder." Unlike "mental abnormality," "personality

*(continued…)*

committed under the SVPA as someone whose psychiatric diagnosis of pedophilia qualified as a "mental abnormality." Hendricks contended, and the Kansas Supreme Court had agreed, that his commitment without a finding that he suffered from a "mental illness" violated his right to substantive due process under the holdings of *Foucha* and *Addington*.[71]

The Supreme Court reversed, holding that a "mental illness" finding was not constitutionally required because the SVPA's "definition of 'mental abnormality' satisfies 'substantive' due process requirements."[72] Under its precedents, the Court explained, "[a] finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment";

---

*(continued...)*
disorder" is a well-established term of art used in psychiatric diagnosis; it refers to "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment." DVM-IV, *supra* note 15, at 645.

[70] According to its original preamble, the SVPA was enacted to reach an "extremely dangerous group of sexually violent predators . . . who do not have a mental disease or defect" but whose "anti-social personality features . . . render them likely to engage in sexually violent behavior." Kan. Stat. Ann. § 59-29a01 (1994). (The preamble later was amended and no longer contains this language.)

[71] *See In re Hendricks*, 912 P.2d 129, 138 (Kan. 1996).

[72] 521 U.S. at 356.

substantive due process requires the state to "couple[] proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'"[73] This coupling is necessary "to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control,"[74] as opposed to "other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings."[75] The SVPA therefore comports with substantive due process, the Court stated, because it "requires proof of more than a mere predisposition to violence"[76]; it "requires a finding of future dangerousness . . . link[ed] . . . to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior."[77] "The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent," said the Court,

---

[73] *Id.* at 358.

[74] *Id.*

[75] *Id.* at 360; *see also id.* at 362 (explaining that the focus on the existence of a disabling mental abnormality or disorder is the basic reason SVPA proceedings are not criminal in nature).

[76] *Id.* at 357.

[77] *Id.* at 358. The Court also held that Hendricks's diagnosis of pedophilia, "a condition the psychiatric profession itself classifies as a serious mental disorder, . . . . plainly suffices for due process purposes." *Id.* at 360.

"with the requirements of . . . other [civil commitment] statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness."[78]

The Court reiterated this constitutional requirement of a mental abnormality or disorder to narrow the class of dangerous persons who are civilly committable when it was called upon in *Kansas v. Crane*[79] to clarify whether due process requires a state to prove that a dangerous individual is "*completely* unable to control his behavior."[80] While the Court rejected such an "absolutist approach" as "unworkable,"[81] it re-emphasized that, to satisfy the requirements of substantive due process:

> [t]here must be proof of serious difficulty in controlling
> behavior. And this, when viewed in light of such
> features of the case as the nature of the psychiatric
> diagnosis, and the severity of the mental abnormality

---

[78] *Id.* at 358.

[79] 534 U.S. 407 (2002).

[80] *Id.* at 411 (emphasis in original).

[81] *Id.* "Moreover," the Court said, "most severely ill people – even those commonly termed 'psychopaths' – retain some ability to control their behavior," and "[i]nsistence upon absolute lack of control would risk barring the civil commitment of highly dangerous persons suffering severe mental abnormalities." *Id.* at 412.

itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.[82]

This distinction must be maintained, the Court said, "lest 'civil commitment' become a 'mechanism for retribution or general deterrence – functions properly those of criminal law, not civil commitment."[83]

Thus, while a history of recidivism may demonstrate a person's dangerousness, *Hendricks* and *Crane* make clear that the history of recidivism is not sufficient to justify civil commitment. Proof of an impairment that causes a serious lack of self-control is also required. A history of recidivism, alone, does not furnish that proof; indeed, in ordinary criminal cases we normally think of recidivism as implying greater blameworthiness, not less. A serious innate inability to control behavior must be shown by identifying the source of that impairment in what *Crane* called "such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself."[84] The

---

[82] *Id.* at 413.

[83] *Id.* at 412 (quoting *Hendricks*, 521 U.S. at 372-73 (Kennedy, J., concurring)).

[84] *Id.*

constitutionality of civil commitment rests on a factual premise: that, in some cases, serious mental abnormalities may render people practically unable to refrain from dangerous sexual (or other) behavior even under the deterrent threat of criminal punishment. The "psychiatric diagnosis" may not be sufficient by itself to establish the necessary impairment.[85] But there must be proof of a "serious mental illness, abnormality, or disorder" of some sort for a court to find the degree of incapacitation required to justify civil commitment based on predictions of future dangerousness.

In sum, to comport with the requirements of substantive due process as enunciated by the Supreme Court, a civil commitment statute must require the court to find that the prospective committee is afflicted with a mental illness, mental abnormality, or mental disorder that makes it seriously difficult for the person to control (i.e., refrain from) his or her dangerous behavior.

---

[85] *See* DSM-IV, *supra* note 15, at xxxiii ("In determining whether an individual meets a specified legal standard (e.g., for competence, criminal responsibility, or disability), additional information is usually required beyond that contained in the DSM-IV diagnosis. . . . [T]he fact that an individual's presentation meets the criteria for a DSM-IV diagnosis does not carry any necessary implication regarding the individual's degree of control over the behaviors that may be associated with the disorder. Even when diminished control over one's behavior is a feature of the disorder, having the diagnosis in itself does not demonstrate that a particular individual is (or was) unable to control his or her behavior at a particular time.").

## C. The Facial Unconstitutionality of the SPA

The SPA authorizes indefinite civil commitment to a mental institution without requiring the court to find in any case that the "patient" suffers from any mental disease, disorder, or abnormality that makes it seriously difficult to control his or her dangerous behavior. The SPA therefore contravenes the requirements of substantive due process enunciated by the Supreme Court and is unconstitutional on its face. Paradoxically, moreover, the D.C. Circuit's "saving" construction of the SPA in *Millard* serves only to make the statute's violation of due process all the more egregious. That is so because anyone suffering from a volitionally disabling mental condition severe enough to satisfy due process would almost certainly be "insane" under *Millard*'s expansive definition of that term, and hence would be *ineligible* for civil commitment under the statute. In other words, under *Millard*, the SPA not only authorizes unconstitutional commitments; perversely, it authorizes *only* unconstitutional commitments.[86] That said, however, it must be recognized that *Millard* did not create the basic due process problem with the SPA, and overruling *Millard* would not solve that problem. Regardless of how broadly

---

[86] If any mental condition could be serious enough to render a person substantially unable to control his or her dangerous sexual behavior, yet would not be serious enough to render the person legally "insane" under *Millard*, no party to this appeal has identified it.

or narrowly the statutory exclusion of "insane" patients may be defined, the SPA offends due process on its face because it authorizes indefinite civil commitment to a mental hospital without requiring proof that the patient is afflicted with *any* mental illness, disorder, or abnormality.

The government argues that the SPA is "consistent" with the requirements of *Hendricks* and *Crane* because it requires a finding – "lack of power to control his or her sexual impulses"[87] – that itself constitutes a mental abnormality. We disagree. The SPA is not consistent with *Hendricks* and *Crane* because those cases require the lack-of-control determination to be grounded in a specific finding of a mental disease, disorder, or abnormality. The SPA fails to require such grounding. It expressly provides that the requisite lack of control is to be found, not from the prospective committee's mental condition, but from his or her "course of repeated misconduct in sexual matters."[88] The SPA thus does precisely what substantive due process forbids – it treats recidivism as establishing lack of control (and, per the government, the constitutionally necessary mental impairment too) instead of

---

[87] D.C. Code § 22-3803(1).

[88] *Id.*

demanding inquiry into whether the recidivism was due to lack of control (attributable to an identified mental impairment).

This critique of the SPA's constitutional deficiency is borne out by the trial court's findings in this case. Adhering to the terms of the statute, the court did not make a finding, required by *Hendricks* and *Crane*, as to whether Mr. Tilley suffered from a mental illness, disorder, or abnormality that seriously impaired his ability to control his sexually dangerous behavior. The court based its finding that Mr. Tilley could not "control his deviant sexual impulses" solely on his "repeated sexual misconduct" and "prior sexual abuse," without linking that behavior or Mr. Tilley's future dangerousness to *any* debilitating mental condition. In other words, the court did not make the findings necessary to distinguish Mr. Tilley from the "dangerous but typical recidivist convicted in an ordinary criminal case."[89] The court did not consider whether it could make the necessary findings on the record before it because the SPA did not require them. Mr. Tilley's civil commitment as a "sexual psychopath" therefore cannot stand.

---

[89] *Crane*, 534 U.S. at 413.

We thus conclude that the SPA "contain[s] a constitutional infirmity that invalidates the statute in its entirety" – it "fails to require the government to prove everything the Constitution requires it to prove for [civil commitment] to be imposed."[90] Moreover, as a court, we cannot undertake to rewrite the SPA in order to save it; that task would not be as simple as merely severing an unconstitutional provision and leaving the rest of the statute as it is.[91] "We cannot ignore the text and purpose of a statute in order to save it."[92] Saving the SPA would require changing it drastically by making difficult policy choices regarding such matters as what kinds of mental disorder and types of impairment must be found to justify civil commitment; how to square those choices with the "not insane" exclusion; and what evidence would be sufficient or necessary to establish those preconditions to commitment.[93] Any such effort would be complicated by the fact that requiring a finding of serious mental disorder would re-raise the equal

---

[90] *Conley v. United States*, 79 A.3d 270, 277 (D.C. 2013) (internal quotation marks and footnotes omitted).

[91] *Id.* at 280-81; *see also* D.C. Code § 45-201(a) (2012 Repl.).

[92] *Boumediene v. Bush*, 553 U.S. 723, 787 (2008).

[93] The blatant facial unconstitutionality of the SPA has spared us from having to address these quite problematic and controversial issues. A vast literature exploring the issues in depth awaits anyone who is inclined to try to resolve them.

protection issues that the court in *Millard* sought to avoid by construing the SPA as inapplicable to the mentally ill. Furthermore, given the existence of the Ervin Act and the Citizens with Intellectual Disabilities Act, and the rarity with which the SPA has been employed in the past fifty years, there are serious questions as to whether there is a need for a rewritten SPA and how it would coexist with those other laws.[94] For all these reasons, undertaking to save the SPA is not this court's prerogative; "we 'do not sit as [a] council of revision, empowered to rewrite legislation in accord with [our] own conceptions of prudent public policy.'"[95] That job is for the legislature.

## III.

For the foregoing reasons, we hold that the SPA is unconstitutional on its face and inapplicable to Mr. Tilley or anyone else. We reverse the judgment of the

---

[94] It appears that a majority of the states do not have civil commitment statutes specifically targeting sex offenders. *See* Smith, *supra* note 32, at 621 (stating that as of 2015, approximately twenty states have enacted Sexually Violent Predator laws).

[95] *Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1247 (D.C. 1990) (quoting *United States v. Rutherford*, 442 U.S. 544, 555 (1979)).

Superior Court, vacate Mr. Tilley's commitment, and remand for any further proceedings consistent with our decision that may be required in his case.

*So ordered.*

THOMPSON, *Associate Judge*, dissenting: Appellant Tilley challenges the order of the Superior Court that civilly committed him pursuant to the Sexual Psychopath Act, D.C. Code § 22-3803 *et seq.* (2012 Repl.) (the "SPA"). The opinion for the court resolves his challenges by striking down the SPA, having concluded that it is unconstitutional on its face. I respectfully dissent. I would have the court adhere instead to the "cardinal principle that a court should first ascertain whether a construction of a statute is fairly possible that will avoid the question of its constitutionality even [if] serious doubt exists as to the statute's validity."[1] Given the SPA's legislative history, I believe such a construction is "fairly possible."[2] Specifically, this is a case in which "the legislative design and

---

[1] *District of Columbia v. Walters*, 319 A.2d 332, 336 (1974).

[2] *Id.*

the limits of the judicial function . . . permit us to read the critical missing elements into the statute[.]"[3]

Under the SPA, "[i]f [a] patient is determined to be a sexual psychopath, the court shall commit him or her to an institution to be confined there until released in accordance with § 22-3809" (which authorizes release from confinement in an institution "when an appropriate supervisory official finds that [the committed person] has sufficiently recovered so as to not be dangerous to other persons"). D.C. Code §§ 22-3808 and 22-3809.  D.C. Code § 22-3803(1) defines a "sexual psychopath" as "a person, not insane, who by a course of repeated misconduct in sexual matters has evidenced such lack of power to control his or her sexual impulses as to be dangerous to other persons because he or she is likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of his or her desire." D.C. Code § 22-3803(1).

The opinion for the court concludes that, taken together, these provisions of the SPA authorize the confinement of persons deemed "sexual psychopaths" without proof that they have any mental disorder or abnormality that causes serious

---

[3] *Conley v. United States*, 79 A.3d 270, 277 (D.C. 2013).

impairment of their ability to control their sexual behavior. In other words, the court holds, by its terms the SPA purports to authorize the civil commitment of persons whose "lack of control" is proven solely on the basis of a "course of repeated misconduct in sexual matters" and not on their having a disabling mental condition. For that reason, the opinion for the court concludes, the SPA is facially unconstitutional, because under Supreme Court jurisprudence, "some additional factor, such as a 'mental illness' or 'mental abnormality'" must be present in order for indefinite involuntary civil commitment to satisfy the requirements of substantive due process.[4]

By its terms, the SPA applies only to individuals who are "not insane" (i.e., not mentally ill[5]), and its statutory language does not explicitly require that the person committed have some other mental abnormality. But the legislative history of the SPA leaves little room for doubt that when Congress enacted the SPA in

---

[4] *Hendricks*, 521 U.S. at 358. The Supreme Court "has repeatedly recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington*, 441 U.S. at 425 (collecting cases).

[5] *See Millard*, 406 F.2d at 973, 968–69. Further, the term "mental illness" is to be accorded "a liberal construction" coextensive with the scope of that term in the Ervin Act. *Id.*; *see also* D.C. Code § 21-541 *et seq.* (2012 Repl.); *Cross*, 418 F.2d at 1097, 1104.

1948, it meant for it to authorize civil commitment of persons whose uncontrolled sexual urges were the product of conditions that needed to be cured or treated — i.e., of abnormal mental conditions. *See* 94 Cong. Rec. 4886, 4887 (1948) (explanation by Rep. MacKinnon that the SPA "provides that sexual psychopaths shall be considered as sick persons"); H. Rept. No. 1787, for H.R. 6071, April 22, 1948 at 5 ("[T]he title essentially provides treatment [of patients] rather than punishment."); H. Subcommittee on the Judiciary of the Committee on the District of Columbia, 80th Cong., 2d Session, Hearing on H.R. 6071 (May 14, 1948) at 43 (referring to commitment under the SPA until the individual is "sufficiently recovered" so as not to be dangerous to other persons); S. Rep. No. 1377, 80th Cong., 2d Session (May 21, 1948) at 5 (same); H. Subcommittee on the Judiciary of the Committee on the District of Columbia, 80th Cong., 2d Session, Hearing on H.R. 6071 (May 14, 1948) at 12 (statement of Rep. Arthur Miller) (referring to sexual psychopaths as "sick people" who "need psychiatric treatment" because they "have something grooved in their brain, or a cell has gone haywire"); *id.*, at 9 (statement of United States Attorney George Morris Fay) (referring to the SPA's purpose of committing sexual psychopaths to St. Elizabeths "where they will try to treat [them] and cure [them]"); *id.*, at 16 (statement of Winfred Overholser,

Superintendent of St. Elizabeths) (referring to sexual psychopaths as "definitely abnormal").[6]

In *Hendricks*, the Supreme Court clarified that the Due Process Clause allows the civil commitment of persons who are not categorized by psychiatrists as "mentally ill" if they are found to be dangerous due to *other* seriously disabling mental abnormalities or disorders.[7] In light of the legislative history cited in the paragraph above, I believe the SPA cannot properly be read to authorize civil commitment of an individual who is afflicted with *no* mental abnormality that seriously impairs ability to control sexual behavior. Read in the manner I believe is correct — i.e., that the SPA authorizes civil commitment of persons whose uncontrolled sexual urges are the product of abnormal mental conditions — the SPA passes substantive-due-process muster.[8]

---

[6] *See also Miller v. Overholser*, 206 F.2d 415, 418–19 (D.C. Cir. 1953) ("[T]he intent and the terms of [the SPA] are for the commitment of [patients not confined for violation of law] to a hospital for remedial [and therapeutic] treatment.").

[7] *See* 521 U.S. at 358–60; *see also id.* at 360 ("Hendricks' diagnosis as a pedophile, which qualifies as a 'mental abnormality' under the [Kansas statute], thus plainly suffices for due process purposes.").

[8] I acknowledge Judge Glickman's observation that "anyone suffering from a volitionally disabling mental condition severe enough to satisfy due process would almost certainly be 'insane' under *Millard*'s expansive definition of that

*(continued…)*

In my view, the problem we confront in resolving this matter is that the trial court did not make the finding that *Hendricks* mandates as a condition of civil commitment under the SPA: a finding regarding whether Mr. Tilley suffers from pedophilia or some other mental abnormality (that does not qualify as a mental illness) that seriously impairs his ability to control his sexually dangerous behavior.[9] I would remand this matter to the trial court for it to resolve that factual issue. On remand, I would leave it to the trial court's discretion, informed by that

---

*(continued…)*
term, and hence would be *ineligible* for civil commitment under the [SPA]." *Ante*, at 34. The *Millard* court made a similar observation, asking whether the SPA's language is not "so meaningless or selfcontradictory as to be constitutionally infirm." 406 F.2d at 972. I do not have broad enough knowledge about the universe of mental disorders to know whether these observations are correct, but I share the *Millard* court's reluctance to declare the SPA invalid given what that court found to be the lack of "evidence of a legislative intent to supersede the [SPA]." *Id.* at 969.

[9] As the opinion for the court notes, Dr. Patterson opined that Mr. Tilley meets the diagnostic criteria for pedophilia, but did not testify that pedophiles lack the power to control their sexual impulses (explaining that if the contrary were true, "then any time . . . they see a child they'd run over and grab the child," but "[t]hat's not what happens."). His point seemed to be that pedophiles, who typically plan and scheme, do not *totally* lack power to control their sexual impulses. His testimony seemed to leave the door open for a finding that Mr. Tilley's has a mental abnormality that makes it difficult for him to control his dangerous sexual behavior, which could be the basis for civil commitment that is consistent with substantive due process. *Cf. Crane,* 534 U.S. at 411–12 (agreeing that *Hendricks* set forth no requirement of total or complete lack of control; it is enough if the commitment statute requires a "'mental abnormality' or 'personality disorder' that makes it 'difficult, if not impossible, for the dangerous person to

*(continued…)*

finding and the parties' advocacy, to determine whether the court should proceed to the long-delayed *Jackson* hearing. I note that Drs. Phillips and Patterson suggested that Mr. Tilley may have the capacity to work with counsel and a better understanding of the charges against him than previous opinions have suggested, so a hearing does not seem futile.

---

*(continued…)*
control his dangerous behavior'") (quoting *Hendricks*, 521 U.S. at 358) (brackets and emphasis omitted).